IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No. 21-277 |
| | : | |
| ZYAIR DANGERFIELD-HILL | : | |
| | : | |

Diamond, J.                                                                                           September 19, 2022

## MEMORANDUM

Charged with carjacking and a related weapons offense, Defendant Zyair Dangerfield-Hill moves to suppress physical and identification evidence. (Doc. Nos. 1, 29); 18 U.S.C. §§ 2, 924(c)(1)(A), 2119. Because Police testimony—substantially corroborated by compelling body camera footage and police radio recordings—confirms that the evidence was lawfully obtained, I will deny the Motion.

## FINDINGS OF FACT

At the June 21, 2022 suppression hearing, the Government called Officer Kevin Semonelle, Sergeant Brad McCabe, and Officer William Kolb—all of whom had served for years in the Philadelphia Police Department. (Doc. No. 38 at 4:11-17 (Semonelle had four years of police experience), 55:1-12 (McCabe nine years), 72:7-9 (Kolb eight years).) The Government also introduced contemporaneous ("real time") video and audio recordings of the Officers' actions. Defendant presented no evidence. I credit the Government's witnesses and evidence, and I find that the Government has proven the following facts by an evidentiary preponderance. Fed. R. Crim. P. 12(d).

All the fast-moving events at issue occurred on April 21, 2021, from 3:26 p.m. to 3:49 p.m.

on West Philadelphia streets that appeared to be almost deserted, except for the Officers and the suspects they pursued.

On April 21, 2021, at 3:26 p.m., Semonelle and McCabe heard a police radio "priority" broadcast of a "robbery, carjacking, point of gun" committed by "four males . . . with firearms" at 4627 Pine Street.  (Id. at 5:2-6:4, 7:6-8:15, 19:10-13; 56:8-13, 73:5-11.)  A minute later, they heard a second broadcast: that four black males wearing black clothing and black masks had carjacked a 2015 silver Mercedes.  (Id. at 9:14-10:15.)  Police learned in a third broadcast, at 3:32 p.m., that the Mercedes was an SUV with a Pennsylvania license plate, and that the carjacking had occurred some five minutes before (i.e., at 3:27 p.m.).  (Id. at 10:24-11:3, 12:9-14.)  Less than five minutes later, Semonelle (who was in uniform, driving a marked car) saw a silver 2015 Mercedes SUV with a Pennsylvania plate some ten blocks to a mile from the carjacking.  (Id. at 14:1-17:4; 19:5-20:7.)  Activating their lights and siren, Semonelle and his partner raced after the SUV for five blocks, when the car crashed into parking poles at 52nd Street and Paschall Avenue.  (Id. at 20:14-22:22.)  Semonelle broadcast a description of the chase and the crash.  (Id. at 14:25-15:2, 23:24-24:1.)

Semonelle saw two men jump from the crashed SUV; a third was captured on Semonelle's body camera.  (Id.)  Still daylight, the Officer chased the two as they ran down Paschall Avenue and up the 1600 block of Wilton Street.  (Id. at 25:12-26:12.)  While Semonelle ran, he broadcast flash descriptions over police radio: the first suspect was wearing a black jacket and black jeans, clutching "the magazine of a firearm sticking from his waistband"; the second suspect (who turned out to be Defendant) was wearing a black hoodie and light blue jeans.  (Id. at 26:17-20, 30:15-29, 32:8-33:15.)  Semonelle broadcast these descriptions "to be sure that the correct people are stopped for investigation."  (Id. at 33:5-9.)  The Officer testified that as he ran after both men (the first seen

on video), the second stopped on the 1600 block of Wilton Street, "looked directly at [Semonelle]," and "put his hands in the air." (Id. at 31:7-13.) The suspect had pulled the mask he had been wearing down around his neck. (Id. at 84:1-10.) Semonelle was ten feet away when he looked at Defendant's "very distinctive face" at 3:34 p.m. (Id. at 32:2-7, 33:21-23, 45:1-12, 53:17-23, 84:1-10.) Even though he saw the suspect only for "a second or so," Semonelle "looked very well at the defendant [he] was chasing" because he knew he would likely be asked to identify him sometime later:

> Obviously there are times where there could be someone wearing the same clothing description, so that's why I found it very important to ensure that I looked very well at the defendant as I was chasing—as he stopped, and I made sure I got a good look at his face specifically so I could make sure if he was captured, I had the right person.

(Id. at 32:21-33:15.) Semonelle then broadcast the following description of this suspect: "[S]ix feet tall, medium build, with a black hoodie and light blue jeans." (Id. at 35:5-10). Another Officer asked over police radio "about the male's complexion." (Id. at 35:17-19.) Having "looked him right in the face," Semonelle responded as he ran that the suspect was "medium complected." (Id. at 35:20-25.)

Semonelle decided to leave Defendant on the 1600 block of Wilton and instead chased the first man, "because [he] knew he had a gun in his waist." (Id. at 29:22-25.) Semonelle caught this man—Yazier Dunbar—and recovered the gun he saw Dunbar throw into an alleyway. (Id. at 26:13-20, 37:21-25.) The Officer then radioed additional information regarding the suspect who had stopped running on the 1600 block of Wilton Street, "so responding officers could look for him as they were coming into the location." (Id. at 27:9-14.)

McCabe ordered that Officers set up a perimeter and search for the others who had fled. (Id. at 56:10-13, 59:23- 25, 60:23-24, 62:13-63:19.) As recorded on McCabe's body camera, at

3:46 p.m.—some twenty minutes after the carjacking; ten minutes after Semonelle left Defendant—McCabe spotted Defendant "trying to conceal himself out of sight" behind a motorcycle in the rear doorway of 1627 Lindenwood—a block from 1600 Wilton. (Id. at 63:16-22, 65:15-19, 66:5-9.) Defendant matched Semonelle's flash description (which McCole had only just heard) "almost to a T." Defendant was trying to hide from McCabe, a block from where Semonelle had left the second suspect scant minutes before. (Id. at 66:11-18.) Trained to "use extreme caution" when a suspect might be armed, McCabe approached with care, drew his gun, and ordered Defendant to stop and show his hands. When Defendant stopped, McCabe handcuffed him because "hands are the weapon delivery with firearms." (Id. at 66:10-14, 67:3-8, 73:9-14) (McCabe: "I didn't want to get shot, first and foremost.").)

McCabe explained that Defendant was not immediately taken to the police station because "at that point he was just detained. We had to confirm, one if he was involved in the—in the incident, and waiting for him to get identified." (Id. at 68:2-6.) Kolb similarly described Defendant as "detained until Officer Semonelle could come over and give a positive or negative ID as he was the one he was chasing." (Id. at 75:24-76:3.)

As Kolb approached, he saw a bulge in Defendant's left pants pocket, which he thought could be a gun. (Id. at 78:20-21 (Kolb: "I've actually recovered personally a gun that was the size of maybe two AirPods put together.").) Before he placed Defendant in the backseat of a police car, he thus patted Defendant down: "it's common practice for the Philadelphia Police Department to search everyone that goes in the back of the police car for weapons or contraband." (Id. at 75:11-21.) Kolb recovered two sets of AirPods from Defendant's pocket: one set in a pink case and the other in a red case with a "Supreme" logo on it. (Id. at 76:4-8.)

Having caught Dunbar, Semonelle learned that another suspect had been detained. (Id. at

37:4-16.) At 3:49 p.m. (some three to four minutes after Defendant surrendered to McCabe) Semonelle went to the patrol car, opened the door, looked at Defendant, and confirmed that he was the man Semonelle had left on Wilton Street. (Id. at 39:9-40:20.) Questioned closely, Semonelle testified credibly that he was "a hundred percent certain" in his identification, which occurred less than fifteen minutes after he had seen Defendant's unmasked face. (Id. at 40:5-9, 50:9-17.)

Defendant was brought to the police station. Following the Police Department's required procedures, Officers retrieved and inventoried all items on Defendant's person, including everything in his pockets. (Id. at 68:18-69:25.) Police thus would have recovered the AirPods from Defendant's pocket even if Kolb had not found them earlier. (See Doc. No. 38 at 68:18-69:25 (Q: "So anything that would've been in the defendant's pockets that was no recovered incident to the searches you described, would that have been processed at the police station?" McCabe: "Yes.").)

## CONCLUSIONS OF LAW

In moving to suppress, Defendant urged that the AirPods are the fruits of an illegal search, and that Semonelle's identification was so unreliable as to violate Due Process. It appears that Defendant has abandoned the second contention.

### I. The AirPods Were Lawfully Seized

#### A. The Police Conducted a Valid Terry Stop

Police may conduct a brief, investigatory stop and protective search when they have a reasonable, articulable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 21 (1968). The officers must "articulate some minimal, objective justification for an investigatory stop." United States v. Robinson, 529 F. App'x 134, 138 (3d Cir. 2013). Reasonable suspicion may be "based on acts capable of innocent explanation." United States v. Blackshear, 2011 WL

5129952, at *6 (E.D. Pa. Oct. 28, 2011), aff'd 532 F. App'x 316 (3d Cir. 2013).  Although an investigatory stop can be based on reasonable suspicion, a warrantless arrest must be based on probable cause.  United States v. Leal, 235 F. App'x 937, 940-41 (3d Cir. 2007).

Defendant urges that McCabe had no reasonable suspicion to stop him based on Semonelle's "vague" description that "likely fits well more than a thousand black men in Philadelphia." (Doc. No. 46 at 7.)  I do not agree.  Viewing the totality of the rapidly changing circumstances, it is plain that McCabe's stop of Defendant was lawful.

First, contrary to Defendant's suggestion, Semonelle's flash description, offered just seconds before McCabe saw Defendant, was not "vague": "a black male wearing a black hoodie, hood over his head, blue jeans, with a medium build and medium complexion, around 6 feet."  Moreover, because, as I have found, the search area was virtually deserted (except for the Police and the men they pursued), McCabe could reasonably rely on Semonelle's flash description.  Moreover, Defendant was trying to hide from McCabe a block from where Semonelle had left Defendant ten minutes before.  These facts gave McCabe at least a "minimal, objective justification" for the stop.

Defendant nonetheless urges that the stop was an illegal, warrantless arrest.  Although two Officers credibly testified that they intended to effect a stop, not an arrest, this is not dispositive.  See id. at 941 (officer's subjective belief not a factor in legal determination whether brief detention constitutes arrest); cf. United States v. Jackson, 652 F.2d 244, 250 (2d Cir. 1981) (officer's subjective belief that his partner had placed the defendant under arrest was "insufficient to convert an otherwise valid Terry stop into an arrest").

For Fourth Amendment purposes, Defendant was detained when he complied with McCabe's order to stop and show his hands.  See United States v. Brown, 448 F.3d 239, 245 (3d

Cir. 2015) (seizure occurs when there is submission to "a show of authority" (quoting California v. Hodari D., 499 U.S. 621, 626 (1991))). To determine whether that detention was a Terry stop or a warrantless arrest, I must consider:

> the duration of the stop, the law enforcement purposes justifying the stop, whether the police diligently sought to carry out those purposes given the circumstances, and alternative means by which the police could have served their purposes.

Leal, 235 F. App'x at 941. Restraining or handcuffing a suspect does not "automatically transform an otherwise-valid Terry stop into a full-blown arrest." United States v. Johnson, 592 F.3d 442, 448 (3d Cir. 2010).

Here, McCabe and Kolb explained that they wanted to hold Defendant briefly so that Semonelle could "give a positive or negative ID." (Doc. No. 38 at 75:24-76:3.) That was permissible. See United States v. Martinez, 462 F.3d 903, 908 (8th Cir. 2006) (reasonable for officers to transport suspect in patrol car to crime scene for show-up identification); United States v. Robinson, 821 F. App'x 141, 145 (3d Cir. 2020) (stop to allow for show-up identification deemed reasonable); United States v. McGrath, 89 F. Supp. 2d 569, 578 (E.D. Pa. 2000) ("[The] defendant was lawfully in detention for a reasonable period for the purpose of conducting further investigation of possible criminal activity by means of a showup."). Defendant was detained for some four minutes: from when he was found hiding behind the motorcycle until Semonelle identified him. That brief stop was warranted by the need to determine whether Defendant was one of the carjackers. Martinez, 462 F.3d at 908. Further, the Officers' decision to handcuff Defendant and pat him down was a reasonable safety measure, given that they were investigating an armed carjacking. See United States v. Edwards, 53 F.3d 616, 618 (3d Cir. 1995) ("[A] police officer, during the course of a Terry stop, may conduct a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed

and dangerous individual." (internal quotation marks omitted)).  Defendant does not argue that Officers failed to act diligently or that there was another means by which they could have served theirgitimate purposes.

Because Defendant was detained and searched pursuant to a lawful Terry stop, the AirPods recovered are admissible.  I will thus deny Defendant's Motion on this ground.

Finally, Defendant, reiterating his contention that his brief detention was an unlawful arrest, urges that his subsequent identification by Semonelle "must be suppressed as the fruit of the poisonous tree."  (Doc. No. 46 at 11.)  Assuming the suggestion is seriously intended—Defendant does not offer supporting argument or reasoning—it is meritless.  As I have discussed, police may, consistent with the Fourth Amendment, detain a suspect briefly for identification purposes.  Martinez, 462 F.3d at 908.  That is exactly what the Officers did here.

### B. Inevitable Discovery

In the alternative, I conclude that the AirPods were properly seized under the inevitable discovery rule.  Suppression may be denied "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means."  United States v. Vasquez De Reyes, 149 F.3d 192, 194 (3d Cir. 1998).  As I have found, the Officers here would inevitably have discovered the AirPods when they followed the Philadelphia Police Department's required procedures, searching Defendant at the police station and making an inventory of his possessions.  (See Doc. No. 38 at 68:18-69:25.)  Because the AirPods are admissible on this alternative ground—which Defendant does not address—I will deny his Motion on this basis as well.  See United States v. Mundy, 621 F.3d 283, 287 (3d Cir. 2010) (inventory searches "'conducted according to standardized criteria' or established routine, consistent with the purpose of a non-investigative search" are reasonable under the Fourth

Amendment) (quoting Colorado v. Bertine, 479 U.S. 367, 374 n. 6 (1983)).

## II.      Identification

Defendant initially moved to suppress Officer Semonelle's identification on due process grounds. (Motion to Suppress; Doc. No. 29 at 17-30.) He appears to have abandoned the contention, however, which he does not address in the Proposed Conclusions of Law he submitted after the suppression hearing. (Doc. No. 46.) In an abundance of caution, I will nonetheless address whether the identification comports with due process.

The Due Process Clause bars "admission of evidence deriving from suggestive identification procedures" that undermine the testimony's reliability. Neil v. Biggers, 409 U.S. 188, 196 (1972). To determine whether an identification "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," I must conduct a two-prong, fact-intensive test. Simmons v. United States, 390 U.S. 377, 384 (1968). First, Defendant must show that "the identification procedure was 'unnecessarily' or 'impermissibly' suggestive." United States v. Stevens, 935 F.2d 1380, 1389 (3d Cir. 1991). This in turn reduces to two sub-inquiries: "that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." Id. (quoting 1 LaFave et al., Criminal Procedure § 7.4(b), at 581 (1984)). If Defendant makes this showing, I must then determine whether, considering the totality of the circumstances, the procedure was "so unnecessarily suggestive and conducive to irreparable mistaken identity as to" deny due process. Foster v. California, 394 U.S. 440, 442 (1969) (internal quotation marks omitted). A number of factors bear on reliability, including:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and confrontation.

United States v. Waters, 428 F. App'x 155, 163 (3d Cir. 2011) (quoting United States v. Brownlee, 454 F.3d 131, 139 (3d Cir. 2006)).  An identification may be reliable even if the witness had only a brief opportunity to see the suspect.  See Brownlee, 454 F.3d at 140; United States v. Lynch, 290 F. Supp. 2d 490 (M.D. Pa. 2003), aff'd 214 F. App'x 248 (3d Cir. 2007).

The Government concedes that Semonelle identified Defendant in suggestive circumstances: handcuffed, in a police car.  Given the rapidly unfolding events on the afternoon of April 21, 2021, however, that suggestive procedure was necessary.  Officers were actively searching for armed carjackers minutes after the robbery occurred.  Briefly detaining Defendant and allowing Semonelle to view him as quickly as possible (less than fifteen minutes after Semonelle had seen Defendant's face; some four minutes after Defendant was first detained by McCabe) was necessary to confirm or refute that Defendant was likely one of the carjackers.  Defendant does not urge another less suggestive procedure that Police could have employed.  See, e.g., United States v. Sleet, 54 F.3d 303, 309 (7th Cir. 1995) ("Immediate showups may, at times, serve legitimate law-enforcement purposes, as they 'allow identification before the suspect has altered his appearance and while the witness' memory is fresh, and permit the quick release of innocent persons.'" (quoting Johnson v. Dugger, 817 F.2d 726, 729 (11th Cir. 1987))); United States v. Antoine, 603 F. App'x 80, 82 n.1 (3d Cir. 2015) (emergency may justify a police identification "on the spot"); United States v. Diaz, 444 F. App'x 551, 555 (3d Cir. 2011) ("'Good reason' for conducting a show-up procedure exists when the identification is conducted proximate to the time and scene of a crime and would enable police to quickly release the suspect if he were not identified as the perpetrator.").

Even though Defendant has not shown unnecessary suggestiveness, I will assess the reliability of Semonelle's identification.  All five of the Brownlee factors weigh against

suppression. As I have found: (1) Semonelle had a very brief but ample opportunity to view the Defendant; (2) Semonelle testified credibly that he concentrated on Defendant's "very distinctive face" during the chase because he knew he would likely have to identify him and did not want to identify the wrong person; (3) the flash description of Defendant broadcast seconds later—including clothes, height, and complexion—was accurate; (4) Semonelle was "a hundred percent certain" in his identification; and (5) Semonelle identified Defendant less than fifteen minutes after seeing his face, and some twenty-three minutes after the carjacking. In these circumstances, even though Semonelle had only "a second or so" to view Defendant, his identification was reliable. See Diaz, 444 F. App'x at 556 (identification reliable when officer "had ample opportunity to view [suspect] at the time of the crime, and he positively identified him shortly after the crime was committed"); Lynch, 290 F. Supp. 2d at 496 (identification reliable when officer had brief opportunity to view suspect, had ample training, was attentive, had high degree of certainty, and made identification within twenty-four hours).

In his Proposed Factual Findings, Defendant emphasizes that Semonelle saw Defendant only briefly. (Doc. No. 46 at 4-5.) As I have discussed, however, courts have allowed identifications based on brief opportunities to see a suspect. See Brownlee, 454 F.3d at 140 (admitting identification by carjacking victim even though "entire carjacking lasted only thirty seconds," and victim conceded that "she spent a predominant amount of that time focused on the weapon"); Lynch, 290 F. Supp. 2d at 496 (admitting identification because "[a]lthough the interval for observation was brief, the witness is a police officer trained in observation and not a casual observer"); Perry v. Varano, No. 09-2765, 2009 WL 6692509, at *9 (admitting identification when lay witness had only five to eight seconds to view the suspect). Any challenge to Semonelle's identification based on his limited opportunity to observe would thus go to the weight the jury

should give the identification, not its admissibility.  <u>Brownlee</u>, 454 F.3d at 140.

Given the totality of the circumstances, I cannot conclude that Semonelle's identification of Defendant "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  <u>Simmons</u>, 390 U.S. at 384.

## **CONCLUSION**

Learning that an armed carjacking had just occurred, the experienced Officers here did not have the luxury of time to deliberate their response.  In the ensuing twenty-three minutes, they took reasonable measures to apprehend four fleeing suspects, consistent with the Officers' safety.  The pat down of Defendant was necessary to ensure that he did not have a gun.  Defendant's brief detention was the only way to determine quickly if he was one of the carjackers.  Finally, the resulting identification was reliable and not unnecessarily suggestive.  I will accordingly deny the Motion to Suppress.

An appropriate Order follows.

September 19, 2022

_____
Paul S. Diamond, J.